282 F.3d 1145
 Marta ZAMBRANO; Margarita Rodriguez; Graciela Lopez; Andrea Ruiz; Martha OZUNA; Jorge Perdoma, Plaintiffs-Appellants,
v.
IMMIGRATION AND NATURALIZATION SERVICE; Edwin Meese; Alan Nelson, Defendants-Appellees.
 No. 00-16191.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 7, 2001.
 Filed March 7, 2002.
 
 Richard M. Pearl, Berkeley, CA, for appellants.
 William J. Howard and Antony W. Norwood, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for appellees.
 Appeal from the United States District Court for the Eastern District of California, Edward J. Garcia, District Judge, Presiding. D.C. No. CV-88-00455-EJG.
 Before: HUG, D.W. NELSON, and HAWKINS, Circuit Judges.
 HUG, Circuit Judge.
 
 OVERVIEW
 
 1
 This case presents the question of whether a court can reconsider the issue of subject matter-jurisdiction for purposes of awarding fees under the Equal Access to Justice Act ("EAJA") when the underlying action had previously been dismissed for lack of subject-matter jurisdiction, and that decision has become final. We conclude that it cannot.
 
 
 2
 Plaintiffs appeal the district court's denial of fees in this class action, which deals with a challenge to regulations as applied and implemented by the Immigration and Naturalization Service ("INS").[1] After dismissing the action for lack of subject-matter jurisdiction, Plaintiffs moved for fees under the EAJA. The district court denied this motion, again basing that decision on lack of subject matter jurisdiction. We affirm.
 
 I. BACKGROUND
 
 3
 This case began as a class action challenge to regulations applied by the Immigration and Naturalization Service ("INS") in connection with its implementation of the legalization provisions of the Immigration Reform and Control Act of 1986 ("IRCA"). The case has a lengthy procedural history spanning ten years in three different courts. Due to the nexus between the case history and the current appeal, the chronology is set forth in considerable detail.
 
 
 4
 In 1988, the district court denied Defendants' motion to dismiss for lack of jurisdiction pursuant to 8 U.S.C. § 1255a(f), and granted the Plaintiffs' motions for preliminary injunction and class certification, certifying two classes of individuals.[2] In 1989, the court granted partial summary judgment in favor of the Plaintiffs, invalidating the challenged regulations and permanently enjoining their enforcement by the Defendants. To effectuate the injunction, Defendants were enjoined from denying work authorizations to or deporting class members.
 
 
 5
 Defendants selectively appealed from the court's orders, contesting only the court's jurisdiction, its extension of the statutory filing deadline, and its order directing the production of confidential information. To the extent challenged, we affirmed the district court's orders. See Zambrano v. INS, 972 F.2d 1122 (9th Cir. 1992). However, the Supreme Court granted certiorari, vacated the judgment and remanded the case to this Court for further consideration in light of the Supreme Court's opinion in Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)("CSS III"). We, in turn, remanded the case to the district court.
 
 
 6
 In CSS III, as in the present case, the Supreme Court did not reach the merits. Instead, while it rejected Defendants' jurisdictional arguments, it nonetheless found other jurisdictional hurdles that neither class of Plaintiffs in the instant case could overcome. First, it found that for those who had not yet applied for legalization (Zambrano Class Two members), their substantive challenge to the regulations was not ripe because those Plaintiffs could not show they had taken all necessary steps to apply for legalization before the regulations were applied to them by the INS. Additionally, the Court found that although the claims of the timely filers (Zambrano Class One members) were ripe, their sole remedy was to raise them before the Circuit Courts of Appeal following issuance of a final order of deportation, as set forth within the statutory scheme. CSS III, 509 U.S. at 60-61, 113 S.Ct. 2485.
 
 
 7
 Although the Supreme Court's decision forcefully closed a door on the thousands of aliens whose timely filed applications were denied because of the challenged regulations, it left open a window through which some of the late filers might be able to maneuver. The Court recognized the possibility of district court jurisdiction over the claims of late filers who had been either actually or constructively "front-desked."
 
 
 8
 "Front-desking" is a term-of-art coined in CSS III to refer to those plaintiffs who were rejected before they even applied because they were told at the "front desk" of an INS office that the challenged regulations would prevent their applications from being approved. The Court noted that this class of persons would have ripe claims. "[A] class member whose application was `front-desked' would have felt the effects of the [challenged] regulation in a particularly concrete manner, for his application for legalization would have been blocked then and there; his challenge to the regulation should not fail for lack of ripeness." CSS III, 509 U.S. at 63, 113 S.Ct. 2485.
 
 
 9
 In addition to those persons who were actually front-desked, the Supreme Court left open the possibility that the existence of the front-desking policy may have concretely affected other late filers sufficiently to render their claims ripe as well. "Although we think it unlikely, we cannot rule out the possibility that further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure not to apply, so that they can be said to have had the[challenged] regulation applied to them in a sufficiently concrete manner to satisfy ripeness concerns." Id. at 2500, n. 28. This group of persons has come to be known as those who were constructively front desked.
 
 
 10
 Since neither CSS nor Zambrano had a fully developed factual record, the Supreme Court remanded for the lower courts to determine, in the first instance, whether any putative class members were front-desked and thus had ripe claims.
 
 
 11
 After Zambrano was returned to the district court in August 1993, and after the parties engaged in a lengthy but unsuccessful attempt at settlement, Defendants moved to dismiss the complaint contending that no claims survived the Supreme Court's opinion in CSS III. Plaintiffs responded by amending their complaint to delete Class One completely and to add new claims. Three of their claims were new, while one, alleging that the public charge regulations violated IRCA, was a carryover from the original complaint. The court dismissed this latter claim for lack of subject matter jurisdiction, finding that Plaintiffs had failed to identify any class members with a ripe claim. The Plaintiffs were allowed to proceed with the three new claims, all of which raised procedural challenges and none of which had been before the Supreme Court in CSS III.
 
 
 12
 On September 30, 1996, Congress enacted the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), a portion of which directly impacted the district court's jurisdiction over the present case. Under § 377 of IIRIRA, which amends IRCA and purports to divest district courts of jurisdiction to consider any claims related to legalization applications, Defendants moved to vacate all prior orders of this court and to dismiss Plaintiffs' third amended complaint.
 
 
 13
 On February 18, 1997, the district court denied Defendants' motion, finding that § 377 of IIRIRA was merely a codification of the Supreme Court's ripeness holding in CSS III, and that Plaintiffs' claims came within one of the Act's express exceptions to its mandatory jurisdictional bar. Having found that the Zambrano class in the third amended complaint contained putative Plaintiffs who satisfied the definition of "constructive front-desking," the district court held that § 377 did not warrant dismissal of the three remaining claims in the third amended complaint.
 
 
 14
 In June of 1997, after the district court denied Defendants' request for reconsideration of their motion to dismiss, they filed an immediate appeal and sought a stay of the court's 1989 interim relief orders which had, inter alia, allowed class members to work and remain in this country pending resolution of the litigation. The court denied Defendants' request for a stay on August 6, 1997.
 
 
 15
 On January 16, 1998, the Ninth Circuit issued an amended opinion which sounded the death knell for both the CSS and Zambrano Plaintiffs. The court explained that with the enactment of § 377 "Congress intended to eliminate federal court jurisdiction over claims by aliens who were not actually subjected to front-desking but [who, nonetheless] failed to file an application because of the front-desking policy." Catholic Social Services v. Reno, 134 F.3d 921, 925 (9th Cir.1998) ("CSS V"). In other words, even claims which raise collateral challenges to the Defendants' procedures and practices in the application process require as a prerequisite class members who were actually front-desked. The court opined that "[a] broader interpretation of § 377 would contravene Congress's clearly expressed intention to `put an end to[this] litigation.' An expansive reading of § 377 would foster litigation to define the parameters of an attempt to file a complete application." Id. at 926.
 
 
 16
 Five days later, Plaintiffs filed a motion seeking to add two recently discovered front-desked persons as class representatives "to quiet any protest by the INS about jurisdiction in this case." The district court denied the motion informing Plaintiffs that Defendants' pending appeal of the court's order denying dismissal divested the court of jurisdiction to consider Plaintiffs' motion to intervene. Plaintiffs, in turn, appealed the order denying intervention.
 
 
 17
 On May 7, 1998, the Ninth Circuit, based on CSS V, granted Defendants' motion for summary disposition of their appeal, vacated all of this court's prior orders, and remanded with instructions to dismiss for lack of subject matter jurisdiction. Zambrano v. INS, 145 F.3d 1344 (9th Cir.1998). Plaintiffs' request for rehearing was denied on July 20, 1998. In addition, their appeal of the district court's order denying intervention was dismissed by this Court on August 21, 1998. Plaintiffs did not petition the Supreme Court for a writ of certiorari, nor did they file a new complaint, as did the plaintiffs in Catholic Social Services.
 
 
 18
 Plaintiffs subsequently moved for fees under the Equal Access to Justice Act ("EAJA") citing all the relief that had been achieved by this litigation. See 28 U.S.C. § 2412(d)(1)(A). The district court denied this motion finding that, as there was no jurisdiction over the underlying action, there was no jurisdiction under the EAJA to award fees. This appeal followed.
 
 II. STANDARD OF REVIEW
 
 19
 The standard of review governing the denial of attorney's fees is abuse of discretion. United States v. 2.6 Acres of Land, 251 F.3d 809, 811 (9th Cir.2001). "An abuse of discretion occurs if the district court incorrectly interprets the EAJA." Ramon v. Soto, 916 F.2d 1377, 1382 (9th Cir.1989) (citing Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 496 (9th Cir.1987)). Finally, as this case involves an interpretation of the jurisdiction requirement, whether the court correctly interpreted EAJA's jurisdictional language is a question of law reviewed de novo. Id.
 
 III. DISCUSSION
 
 20
 The limited waiver of sovereign immunity under which Plaintiffs sought fees is 28 U.S.C. § 2412(d)(1)(A). That statute states:
 
 
 21
 Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, ... incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
 
 
 22
 28 U.S.C. § 2412(d)(1)(A) (emphasis added).
 
 
 23
 
 1. Jurisdiction over the Underlying Action.
 
 
 
 24
 In order for a court to award fees under the EAJA, it must have jurisdiction over the underlying action. See Clark v. Busey, 959 F.2d 808, 810 (9th Cir.1992) ("Subject matter jurisdiction to decide the merits of the underlying action is a `condition precedent' to an award of fees or costs under the EAJA."); Smith v. Brady, 972 F.2d 1095, 1097 (9th Cir.1992) ("if the district court lacked jurisdiction over the underlying suit, `it had no authority to award attorney's fees'" (quoting Latch v. United States, 842 F.2d 1031, 1033 (9th Cir. 1988))).
 
 
 25
 We have held that, when the fee-shifting statute does not provide an independent grant of jurisdiction, fee shifting statutes cannot themselves confer subject-matter jurisdiction. See e.g. Branson v. Nott, 62 F.3d 287, 292-93 (9th Cir.1995). We have consistently applied this rule to a broad array of fee-shifting statutes.
 
 
 26
 For example, in In re Knight, 207 F.3d 1115 (9th Cir.2000), this Court addressed the propriety of entertaining an attorney fee application under Section 502(g)(1) of the Employee Retirement Income Security Act (ERISA), when the underlying action had been dismissed for lack of subject matter jurisdiction. This Court, reversing the district court's grant of attorney fees, held that because the district court lacked subject matter jurisdiction under ERISA to hear the plaintiff's substantive claim, it similarly lacked jurisdiction "to apply the statute's cost and fee-shifting provision..." Id. at 1116-17.
 
 
 27
 Similarly, in Branson, we considered the fee-shifting provisions of 42 U.S.C. § 1988. We held that:
 
 
 28
 [B]ecause the district court lacked subject matter jurisdiction over [the] purported civil rights claim in the first instance, it also lacked the power to award attorney's fees under the civil rights attorney fee statute. By itself, § 1988 does not provide the district court with jurisdiction to grant an attorney fee award where subject matter jurisdiction to hear the underlying § 1983 claim is lacking....
 
 
 29
 62 F.3d at 292-93 (footnote omitted).
 
 
 30
 Finally, in Latch v. United States, 842 F.2d 1031 (9th Cir.1988), we held in the context of a fee-shifting statute dealing with tax refund cases instituted against the United States that:
 
 
 31
 [I]t is apparent that 26 U.S.C. § 7430 does not contain an independent grant of subject matter jurisdiction. It allows attorney's fees only in "civil proceeding[s]... brought ... in connection with the determination, collection, or refund of any tax ... and brought in a court of the United States." Therefore, since the district court lacked jurisdiction to entertain the tax claim, it had no authority to award attorney's fees.
 
 Id. at 1033 (citations omitted)
 
 32
 It is true that Knight, Branson, and Latch deal with ERISA, § 1988, and the tax code, respectively. However, the basis of these decisions was not the specific fee-shifting statute involved but was, instead, the fact that the fee-shifting statute did not provide an independent grant of subject-matter jurisdiction. Just like ERISA and § 1988, the EAJA, which is at issue here, does not provide such a grant of jurisdiction. See 28 U.S.C. § 2412(d)(1)(A). Accordingly, subject matter jurisdiction over the underlying action is a prerequisite.
 
 
 33
 In the present case, Plaintiffs' underlying action was dismissed for lack of subject-matter jurisdiction, and that decision has become final. As a result, the EAJA cannot now supply the jurisdiction that was previously missing.[3]
 
 
 34
 
 2. Reconsideration of Jurisdiction.
 
 
 
 35
 Plaintiffs also raise a slightly different argument. Plaintiffs argue that although the underlying action was dismissed for lack of subject matter jurisdiction, a court can take a second look at whether jurisdiction exists in that earlier action during the fee request phase of litigation. In support of this contention, Plaintiffs rely on a case from the Sixth Circuit, Greater Detroit Resource Recovery Auth. v. EPA, 916 F.2d 317, 320 (6th Cir.1990), as well as a decision from the United States District Court in the District of Columbia, Antosh v. Federal Election Comm'n, 664 F.Supp. 5, 7 (D.D.C.1987). However, Plaintiffs' reliance is misplaced.
 
 
 36
 In both Greater Detroit and Antosh, the issue of jurisdiction did not arise until the prevailing party filed a claim for fees under the EAJA. Id. It was in that context that those courts ruled they should evaluate jurisdiction for the purposes of EAJA. In other words, in the underlying proceedings, jurisdiction was never at issue; it was simply presumed to exist. In the present case, however, the district court fully decided the issue of jurisdiction, and that judgment has now become final.
 
 
 37
 As we held in Knight, we will not reexamine the issue of jurisdiction in a decision that has become final. 207 F.3d at 1116. We noted that "[Plaintiff] did not timely appeal the district court's dismissal for lack of subject matter jurisdiction and cannot, of course, raise the issue now." Id. We also stated that "the district court held that it lacked jurisdiction over the case (which we must accept as given since the decision has not been appealed.)" Id. at 1117. Such a conclusion comports with traditional notions of issue and claim preclusion. See 18 Moore's Fed. Practice 3d § 132.01[2] ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.")
 
 
 38
 The district court dismissed Plaintiffs' class action after this Court vacated the district court's interlocutory orders and remanded the case with instructions to dismiss for lack of subject matter jurisdiction. See Zambrano, 145 F.3d at 1344. The decision became final and unappealable when Plaintiffs did not petition for a writ of certiorari following this Court's denial of a rehearing. Accordingly, Plaintiffs cannot now seek to relitigate the issue of subject matter jurisdiction.
 
 
 3. Legal Immigration Family Equity Act
 
 
 39
 Plaintiffs argue that Congress has retroactively, through changes to amnesty law, restored subject matter jurisdiction over this case. The changes on which Plaintiffs are relying came about on December 21, 2000, eight months after the district court denied Plaintiffs' EAJA application. That day, former President Clinton signed into law two bills that amend the Immigration and Nationality Act and give eligible class members in three class-action legalization cases a new opportunity to apply for lawful permanent residence. The first of the two bills, H.R. 4942, 106th Cong. (2000), the "District of Columbia Appropriations Act, 2001," in addition to providing appropriations for several departments and agencies, allows eligible applicants from the Catholic Social Services v. Reno and League of United Latin American Citizens v. INS (LULAC) class-action lawsuits to apply anew for legalization. See Legal Immigration Family Equity Act (LIFE Act), Pub.L. No. 106-553, Title XI, 114 Stat. 2762, *2762A-352-366 (2000). The second, H.R. 4577, 106th Cong. (2000), the "Departments of Labor, Health and Human Services, and Education, and Related Appropriations Act, 2001," amended the LIFE Act to extend its benefits to eligible Zambrano class applicants. See Life Act Amendments of 2000 (LIFE Act Amendments), Pub.L. No. 106-554, Title XV, 114 Stat. 2763 (2000).
 
 
 40
 Plaintiffs argue that the LIFE Act has retroactively bestowed jurisdiction on the district court for purposes of awarding fees under the EAJA. In support of this position, Plaintiffs point to the following language from the LIFE Act:
 
 
 41
 (8) JURISDICTION OF COURTS. — Effective as of November 6, 1986, subsection (f)(4)(C) of such section 245A [§ 377 of IIRIRA] shall not apply to an eligible alien described in subsection (b) of this section.[4]
 
 
 42
 Title XI, 114 Stat. 2762, *2762A-352-366. However, in reading the entire LIFE Act, it is clear that Congress was merely giving eligible class applicants a new opportunity to submit new applications that must satisfy new requirements.
 
 
 43
 The LIFE Act and LIFE Act Amendments amend the amnesty provisions of 8 U.S.C. § 1255a with specific reference to "eligible" class applicants in CSS, LULAC, and Zambrano. Id. Basically, the new amnesty provisions allow eligible class applicants in those class actions a new one-year period to apply for lawful permanent residence. Id. The statute provides that the year begins to run from the date the INS issues final implementing regulations, which it was required to do within 120 days of the LIFE Act's December 21, 2000, enactment. Id. These new applications must satisfy LIFE Act requirements. Among these requirements are that the applicants must have entered the United States before January 1, 1982, and, from then until May 4, 1988, resided here continuously and unlawfully. Id. Eligible aliens are those who filed written claims for class membership prior to October 1, 2000, pursuant to court orders in CSS, LULAC, or Zambrano. Id.
 
 
 44
 The overall scheme of the new legislation reflects that the retroactive repeal of § 377 (the provision relied upon by Plaintiffs) was meant to remove a jurisdictional obstacle to litigation that could ensue over applications pursuant to the newly amended amnesty provisions, and not that it was intended to retroactively bestow jurisdiction on the district court for the purposes of awarding fees.
 
 
 45
 Plaintiffs argue that, regardless of Congressional intent, by retroactively repealing § 377, Congress vested the district court with jurisdiction, and the court can therefore award fees. However, for this argument to prevail, Congress would have to undo a final judgment of this Court. This cannot be done. "Having achieved finality ... a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).
 
 
 46
 In the present case, Congress retroactively repealed § 377 two and a half years after final judgment issued and eight months after the district court denied the EAJA application. That repeal does not change the critical inquiry. Congress waived sovereign immunity to EAJA awards only in "any court having jurisdiction of that action," 28 U.S.C. § 2412(d)(1)(A), and did not include in the EAJA an independent grant of jurisdiction. Therefore, that critical inquiry is whether this Court has entered a final judgment — not subject to further review — that the district court did not have jurisdiction over Plaintiffs' "action." Id. This Court's order of May 7, 1998, that summarily dismissed an appeal in the class action, vacated the district court's interlocutory orders, remanded the case to the district court to dismiss for lack of jurisdiction, and ordered its mandate to issue forthwith leaves no doubt about the existence of such a judgment. See Zambrano v. INS, 145 F.3d at 1344.
 
 
 47
 Plaintiffs argue, however, that Congress is merely waiving the defense of issue and claim preclusion against itself. It is true that Congress may waive the effect of collateral estoppel in suits against the government. See United States v. Sioux Nation, 448 U.S. 371, 397, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) ("Congress has the power to waive the res judicata effect of a prior judgment entered in the Government's favor on a claim against the United States."). However, such Congressional acts have only been upheld in the context of Congress providing a new forum for litigants to pursue their old claims. The Supreme Court enunciated this principle in Sioux Nation. Id. In that case, the Court was dealing with the constitutionality of a special jurisdictional statute which provided for de novo review of the merits of a decision of the Indian Claims Commission that an 1877 enactment effected a taking of the Black Hills from the Sioux Indians. The Supreme Court stated that:
 
 
 48
 When Congress enacted the amendment directing the Court of Claims to review the merits of the Black Hills claim, it neither brought into question the finality of that court's earlier judgments, nor interfered with that court's judicial function in deciding the merits of the claim. When the Sioux returned to the Court of Claims following passage of the amendment, they were there in pursuit of judicial enforcement of a new legal right. Congress had not "reversed" the Court of Claims' holding that the claim was barred by res judicata, nor, for that matter, had it reviewed the 1942 decision rejecting the Sioux' claim on the merits. As Congress explicitly recognized, it only was providing a forum so that a new judicial review of the Black Hills claim could take place. This review was to be based on the facts found by the Court of Claims after reviewing all the evidence, and an application of generally controlling legal principles to those facts. For these reasons, Congress was not reviewing the merits of the Court of Claims' decisions, and did not interfere with the finality of its judgments. Moreover, Congress in no way attempted to prescribe the outcome of the Court of Claims' new review of the merits. That court was left completely free to reaffirm its 1942 judgment that the Black Hills claim was not cognizable under the Fifth Amendment, if upon its review of the facts and law, such a decision was warranted.
 
 
 49
 Id. at 406-407, 100 S.Ct. 2716.
 
 
 50
 If there is a constitutional way to interpret a statute, we are obligated to adopt it. See NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Accordingly, we hold that here, as in Sioux Nation, Congress was not reversing the Court's final determination that subject matter jurisdiction did not exist in the Zambrano class-action. Instead, Congress was merely providing a new forum to raise the claim again, with new legal principles to be applied. Congress made no mention of granting jurisdiction for purposes of awarding fees in already concluded litigation and if the LIFE Act is to be read as retroactively restoring subject matter jurisdiction in the already concluded Zambrano class action, it would be unconstitutional. We avoid such a reading.
 
 IV. CONCLUSION
 
 51
 In conclusion, the earlier dismissal for lack of subject-matter jurisdiction is binding on the determination of jurisdiction for purposes of awarding fees under EAJA. The previous dismissal, which has become a final judgment, is dispositive.
 
 
 52
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 At issue in the underlying litigation were two INS regulations relating to public charges, one defining "public cash assistance," and another setting forth documentation for showing "proof of financial responsibility."See 8 C.F.R. §§ 245a(i) & 245a.2(d) (1988). For purposes of this appeal, however, those regulations are immaterial.
 
 
 [2]
 Class One consisted of those aliens who had already filed applications for legalization (timely filers), while Class Two comprised aliens who had not yet applied (late filers)
 
 
 [3]
 Plaintiffs in this case did not ask for fees for any work done after 1993. Thus we are not confronted with the question of whether Congress, as opposed to a higher court deciding jurisdictional issues on direct appeal, may eliminate the possibility for fees under the EAJA by passing a retroactive, jurisdiction-stripping statute
 
 
 [4]
 As stated earlier, it was § 377 of IIRIRA which ultimately stripped the district court of jurisdiction over the underlying action