**CATHOLIC SOCIAL SERVICES, INC., (Centro de Guadalupe Immigration Center), et al., Plaintiffs,**

v.

**John ASHCROFT, Attorney General of the United States of America, et al., Defendants.**

No. CIV.S–86–1343 LKK.

United States District Court, E.D. California.

July 25, 2002.

Peter A. Schey, Center for Human Rights and Constitutional Law, Los Angeles, CA, Michael Rubin, Altshuler, Berzon, Nussbaum Rubin, and Demain, San Francisco, CA, Luis Alfonso Cespedes, Law Offices of Luis Alfonso Cespedes, Sacramento, CA, Stephen Allen Rosenbaum, Protection and Advocacy, Inc., Oakland, CA, Robert H. Gibbs, Robert Pauw, Gibbs Houston Pauw, Seattle, WA, for plaintiffs.

Carlos Holguin, Center for Human Rights and Constitutional Law, Los Angeles, CA, for intervenors.

Glyndell E. Williams, U.S. Atty., Sacramento, CA, Earle B. Wilson, Andrew C. MacLachlan, Dept. of Justice Office of Lit., Washington, DC, for defendants.

## ORDER

KARLTON, Senior District Judge.

Plaintiffs seek relief from, *inter alia*, the consequences of the application of an INS regulation that precluded otherwise eligible aliens from requesting an adjustment of status under the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. 99–603, 100 Stat. 3359, *codified at* 8 U.S.C. §§ 1255a *et seq.* (1986). Plaintiffs also bring claims for relief premised on defendants' front-desking policy, described herein, and on the restriction of jurisdiction set forth in § 377 of IIRIRA, 8 U.S.C. § 1255a(f)(4)(C), as modified by Section 1104(c)(8) of the LIFE Act. Before me are the parties' cross-motions for partial summary judgment,[1] as well as defendants' motion for reconsideration of this court's order reopening *CSS I.* The standards for these motions are well-known and need not be repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *United States v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997). I decide these motions on the pleadings and papers filed herein and after oral argument.

## I.

### BACKGROUND

The Ninth Circuit has observed that "[t]his litigation has a long and unhappy history." *Catholic Social Services v. INS,* 232 F.3d 1139, 1141 (9th Cir.2000). In the

---

1. Because of a remaining discovery dispute, motions on plaintiffs' claim challenging the restriction of jurisdiction have been severed.

two years since, the history has, of course, become longer and, if not more unhappy, at least more bewildering for those plaintiffs who, some fourteen years ago, were granted the remedy they now seek.

The case began with an INS interpretation of a provision of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. 99–603, 100 Stat. 3359, *codified at* 8 U.S.C. §§ 1255a, *et seq.* (1986). In IRCA, Congress had created an amnesty program whereby aliens who had been in the United States unlawfully since January 1, 1982 could, during a specified twelve-month period, apply for adjustment of status. *See id.* To receive adjusted status, aliens had to be able to show that they had been continuously physically present in the United States since November 6, 1986. *See* 8 U.S.C. § 1255a(a)(3)(A). This requirement was mitigated with the qualification that "[a]n alien shall not be considered to have failed to maintain continuous physical presence in the United States ... by virtue of brief, casual and innocent absences." 8 U.S.C. § 1255a(3)(B).

In the same month that the statute took effect, November of 1986, the INS sent a telex to all of its offices interpreting "brief, casual, and innocent absences" to be those for which the alien had obtained advance parole from the INS. The INS later issued a regulation to the same effect, which stated:

> *Brief, casual,* and *innocent* means a departure authorized by the Service (advance parole) subsequent to May 1, 1987 of not more than thirty days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control.

8 C.F.R. § 245a.1(g) (emphasis in original).

Because the INS also instructed immigration officers to screen applicants and to reject the application of those who were "statutorily ineligible," *see Reno v. Catholic Social Services,* 509 U.S. 43, 61, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), many aliens felt the effects of this interpretation as soon as they submitted an application. Some would-be applicants were screened even before they had filled out an application and were denied a form if they admitted to leaving the country without advance parole.

Plaintiffs filed suit challenging the validity of the advance parole policy in the same month the policy was issued. This court certified a class composed of "[a]ll persons prima facie eligible for legalization under INA § 245A who departed and reentered the United States without INS authorization (i.e., 'advance parole') after the enactment of IRCA following what they assert to have been a brief, casual and innocent absence from the United States." May 3, 1988 Order at 2–3. In a separate order filed that month, this court held that the INS interpretation of the continuous presence requirement was inconsistent with the statutory scheme and declared the regulation invalid. *See Catholic Social Services v. Meese,* 685 F.Supp. 1149 (E.D.Cal.1988).

The government did not appeal the ruling on the merits. This court's subsequent remedial orders, however, were appealed. In particular, the INS challenged orders that extended the application period for the plaintiff class and mandated procedures for determining whether an alien was covered by the injunction. The Ninth Circuit affirmed these orders in *Catholic Social Services, Inc. v. Thornburgh,* 956 F.2d 914 (9th Cir.1992). The Supreme Court granted *certiorari* and the Ninth Circuit stayed its mandate.

In the meantime, the parties were engaged in litigation over temporary protection for the plaintiff class. While the gov-

ernment's appeal to the Ninth Circuit was pending, the final remedy ordered by this court had been stayed. A series of orders by this court and the Ninth Circuit provided that plaintiffs who could show prima facie eligibility for legalization were entitled to stays of deportation, release from custody, and temporary employment authorization. After the Supreme Court granted *certiorari*, these orders remained in effect, *see Reno*, 509 U.S. at 53 n. 13, 113 S.Ct. 2485, and additional litigation ensued over their enforcement. Finally, by way of a stipulated order filed March 4, 1993, the parties agreed that the temporary relief orders would be enforced pursuant to national standards agreed upon by the parties. As part of the agreement, the parties instituted a uniform procedure for determining whether an alien was actually a class member, and thus entitled to interim relief. *See* March 4, 1993 Stipulation and Order, National Standards at 1. This class membership determination process would later be the source of great confusion.

Upon review, the Supreme Court did not reach the propriety of the court's substantive ruling nor the validity of the remedy ordered by this court. Rather, the Supreme Court addressed whether plaintiffs' claims were ripe. The Court explained that "a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him." *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 59, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Specifically, the Court stated that a class member whose complet-

ed application and fee, by virtue of the regulation, had not been accepted, would have a ripe claim. Having no evidence before it that any class members had their applications turned away at the front desk in this manner, the court remanded for a ripeness determination. *Id.* at 66–67, 113 S.Ct. 2485. The Court left open the question of whether or not class members who were not "front-desked" could "demonstrate that the front-desking policy was nevertheless a substantial cause of their failure to apply, so that they can be said to have had the 'advanced parole' . . . regulation applied to them in a sufficiently concrete manner to satisfy ripeness concerns." *Id.* at 66 n. 28, 113 S.Ct. 2485. The Ninth Circuit would later determine that indeed there were individuals who were not front-desked but who had the regulation applied to them in a concrete manner. *Catholic Social Services v. INS*, 232 F.3d 1139, 1146 (9th Cir.2000) ("at a minimum" aliens who "told their story to an INS officer at the from desk, were told that they were ineligible to apply, and were turned away without an application" had ripe claims).

After remand, plaintiffs filed a Seventh Amended Complaint, containing a modified class definition. This court denied defendants' motion to dismiss the Seventh Amendment Complaint after finding that plaintiffs' claims for relief were within the jurisdiction of the court and were ripe for adjudication under the Supreme Court mandate in this case, as well as under the Circuit's analyses in *McNary v. Haitian Refugee Center*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) and *Villarina v. INS*, 18 F.3d 765 (9th Cir.1994).[2] *See*

---

2. The Seventh Amended Complaint did not include any named plaintiffs who alleged that they tendered completed applications to an INS officer during the relevant period and had the application rejected based on the advance parole regulation. The Seventh Amended Complaint did, however, include allegations from three named plaintiffs that they went to an INS office and were refused an application form by a legalization officer. Seventh Am. Compl. at ¶¶ 18–20.

March 17, 1995 Order. The court also approved the new class which included:

All persons, otherwise eligible for legalization under IRCA, who, after November 6, 1986, depart or departed the United States for brief, innocent and casual absences without advance parole, and who (i) are therefore deemed ineligible for legalization, or (ii) were informed that they were ineligible to apply for, or were ineligible for legalization, or were refused by the INS or its QDEs legalization forms, and for whom such information, or inability to obtain the required application forms, was a substantial cause of their failure to timely file or complete a written application.

November 3, 1995 Order. Defendants appealed.

The November 3, 1995 Order proved to have serious consequences for many class members in the years to follow. Having ordered cross-motions for summary judgment, and losing sight of the original purpose of the class membership determination process, the court ordered the INS to continue accepting membership applications for only one more month. This court observed that "a determination on the merits will coincide with final determinations of class membership so that any remedial orders can be applied to a definable group of individuals." November 3, 1995 Order at 14:10–11; 17:17–20. In sum, the court confounded the application process with class membership per se.[3] This court

detected the error and later recognized that the class membership application process had related only to interim relief.[4] *See* February 15, 2002 Order. In the meantime, however, the misapprehension of the class membership process prevailed and would be reiterated in large and small ways.

While the defendants' appeal in this case was pending, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). *See* Pub.L. No. 104–208, 110 Stat. 3009 (1996). Section 377 of IIRIRA, codified at 8 U.S.C. § 1255a(f)(4), divested the federal courts of jurisdiction over legalization-related claims unless the "person asserting an interest ... attempted to file a complete application and application fee with an authorized legalization officer of the [Immigration and Naturalization] Service but had the application and fee refused by that officer." A divided panel of the Ninth Circuit held that enactment of § 377 of the IIRIRA stripped this court of jurisdiction over the named plaintiffs' claims and directed this court to dismiss the case. *Catholic Social Services, Inc. v. Reno*, 134 F.3d 921 (9th Cir.1997). Following the Ninth Circuit remand, this court dismissed the plaintiff class without prejudice for lack of subject matter jurisdiction.[5] Plaintiffs filed a new action, hereinafter referred to as *CSS II*, for the subset of class members over whose claims the court still had jurisdiction. The court provisionally certified a class in this new action and issued a pre-

---

3. While, of course, this court is responsible for its error, I note in mitigation that the parties shared in the court's misapprehension.

4. Indeed, given that the court had just certified a new class, class membership determinations made under the previous class definition would not have been an appropriate method for determining eligibility for final relief in any event.

5. Thereafter, on June 18, 1998, the Circuit issued an order recalling the mandate. This court concluded that the existence of an ongoing case was implicit in the Circuit's assertion of power to recall the mandate, and accordingly vacated its March 10, 1998 order dismissing the case. The Circuit then again issued its mandate and this court again dismissed the case.

liminary injunction. Because the misapprehension of the class membership determination process still prevailed at that time, however, the class was limited, not only to those who had actually filed for legalization under IRCA, but also to "persons who timely filed for class membership under *Catholic Social Services, Inc. v. Reno,* CIV No. S–86–1343 LKK (E.D.Cal.)," and were determined to be eligible for class membership. *See* July 2, 1998 Order.[6] The limited class certification was without prejudice to a motion to certify a modified class. *See id.* at 40 n. 39.

In an order issued June 30, 1999, the Ninth Circuit reversed this court's preliminary injunction. Upon rehearing en banc, however, on November 21, 2000 the Ninth Circuit affirmed this court's determination that the plaintiffs had a right to maintain a successive class action and found that the court did not err in granting the preliminary injunction. In addition, the Ninth Circuit held that the court could consider an equal protection challenge to § 377 of IIRIRA by those plaintiffs whose claims the statute effectively foreclosed. *Catholic Social Services v. INS,* 232 F.3d 1139 (2000).

On December 18, 2000, the Ninth Circuit granted the Government's motion to stay its mandate pending Supreme Court consideration of any petition for *certiorari* that might be filed. Shortly thereafter, Congress passed, and on December 21, 2000, the President signed into law, the Legal Immigration Family Equity ("LIFE") Act as part of the Department of Commerce, Justice, and State, the Judicia-

ry, and Related Agencies Appropriations Act, 2001. *See* Pub.L. No. 106–553, 1114 Stat. 2762 (Dec. 21, 2000). The LIFE Act provided that eligible aliens be afforded a new application period in which to apply for legalization under the provisions of section 245A of the INA, 8 U.S.C. § 1255a (2000), with certain modifications set forth in the LIFE Act. *See* LIFE Act § 1104. In addition, the LIFE Act repealed § 377's limitation on subject matter jurisdiction over claims by "eligible aliens," *nunc pro tunc.* Once again, however, the misperception of the class membership process in this case would be significant. An eligible alien, the Act provided, is one who "before October 1, 2000 ... filed with the Attorney General a written claim for class membership, with or without a filing fee, pursuant to a court order issued in the case[ ] of [inter alia] ... *Catholic Social Services v. Meese,* 685 F.Supp. 1149 (E.D.Cal.1988), *vacated sub nom. Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)." LIFE Act § 1104(b).

On the basis of the enactment of LIFE, on January 6, 2001, the Government filed a motion to vacate as moot the Ninth Circuit's *en banc* judgment, as well as the class-wide preliminary injunctive relief issued by this Court. Plaintiffs opposed the Government's motion contending, among other things, that by eliminating the jurisdictional bar to suit by persons who were allegedly discouraged from filing an application for legalization, *see* LIFE § 1104(c)(8) and (f) (making IIRIRA § 377 inapplicable to individuals covered by the

---

**6.** The class was defined as follows:
 All persons who timely filed for class membership under *Catholic Social Services, Inc. v. Reno,* CIV No.–86–1343 LKK (E.D.Cal.), and who were otherwise prima facie eligible for legalization under section 245A of the INA and who were thus granted class membership, and who tendered completed applications for legalization under section 245A of the INA and fees to an INS officer or agent acting on behalf of the INS, including a QDE, during the period from May 5, 1987 to May 4, 1988, and whose applications were rejected for filing because they had traveled outside the United States after November 6, 1986 without advance parole.

LIFE Act), Congress intended for *CSS I* class members to proceed with their claims before the federal courts in *CSS II*. On February 13, 2001, the Ninth Circuit *en banc* denied the Government's motion to vacate, and ordered the immediate spread of the mandate.

Given the extraordinary circumstance presented by the LIFE Act's repeal of § 377, this court entertained plaintiffs' motion to reopen *CSS I* under Federal Rule of Civil Procedure 60(b). After hearing, this court concluded that certain plaintiffs would suffer injury if the court did not reinstate *CSS I*, as there were potential differences between the relief available under the LIFE Act and that available to class members under IRCA.[7] Accordingly, the court reinstated *CSS I* as to those class members over whose claims it again had jurisdiction pursuant to LIFE.

In February of 2002, the court considered plaintiffs' motion to modify the class to include people who had not applied for class membership. Revisiting the ancient history of this case, the court found that the class membership determination process had been instituted for the sole purpose of determining eligibility for interim relief. Nonetheless, the court recognized that § 377's jurisdictional bar had not been repealed as to plaintiffs who had not applied for class membership. Thus, it lacked jurisdiction over these plaintiffs' claims, except to the extent that they challenged the constitutionality of the jurisdictional bar itself. *See* February 15, 2002 Order. The court modified the class definition to include three subclasses as follows:

(1) All persons who were otherwise prima facie eligible for legalization under section 245A of the INA, and who tendered completed applications for legalization under section 245A of the INA and fees to an INS officer or agent acting on behalf of the INS, including a QDE, during the period from May 5, 1987 to May 4, 1988, and whose applications were rejected for filing because they had traveled outside the United States after November 6, 1986 without advance parole.

(2) All persons who filed for class membership under *Catholic Social Services, Inc. v. Reno*, CIV No. S–86–1343 LKK (E.D.Cal.), and who were otherwise prima facie eligible for legalization under section 245A of the INA, who, because they had traveled outside the United States after November 6, 1986 without advance parole were informed that they were ineligible for legalization, or were ineligible for legalization, or were refused by the INS or its QDEs legalization forms, and for whom such information, or inability to obtain the required application forms, was a substantial cause of their failure to timely file or complete a written application.

(3) All persons who did not file an application for class membership in *Catholic Social Services, Inc. v. Reno*, CIV No. S–86–1343 LKK (E.D.Cal.), but who were otherwise prima facie eligible for legalization under section 245A of the INA, who, because they had traveled outside the United States after November 6, 1986 without advance parole were informed that they were ineligible for legalization, or were ineligible for legaliza-

---

**7.** These differences were seen in (1) the continuous unlawful residence requirements; (2) the periods of continuous physical presence required; (3) the definitions of the exception for "brief, casual and innocent," absences; and (4) the "admissibility" standards regarding the financial responsibility of the applicants. *See* August 27, 2001 Order at 12–16.

tion, or were refused by the INS or its QDEs legalization forms, and for whom such information, or inability to obtain the required application forms, was a substantial cause of their failure to timely file or complete a written application.

The court certified subclass three (3) for the limited purpose of challenging the jurisdiction-stripping provisions of § 377 of IIRIRA on Equal Protection grounds, unless and until that challenge proved successful, at which time members of subclass three could seek relief from the INS regulation challenged by subclasses one (1) and two (2). *See* February 15, 2002 Order.

## II.

### THE PRESENT MOTIONS

Although the motions before the court briefly revisit the merits determination made so long ago, the parties' arguments center on this court's jurisdiction over plaintiffs who were not members of *CSS II* and on the justiciability of plaintiffs' claims. I begin by considering defendants' motion for reconsideration of this court's order reopening *CSS I*.

### A. THE EFFECT OF *ZAMBRANO v. INS*

■ Defendants argue that under *Zambrano v. INS*, 282 F.3d 1145, 2002 WL 356299 (9th Cir.2002), the court's 1998 decision to dismiss *CSS I* is binding and cannot be relitigated. As such, defendants argue, it was improper for this court to reopen *CSS I* and the order should be reconsidered.

Like the *CSS* class, *Zambrano* plaintiffs had seen their action challenging the implementation of IRCA dismissed for lack

of jurisdiction pursuant to § 377 of IIRIRA. As the Ninth Circuit noted, however, unlike those in *CSS*, the *Zambrano* plaintiffs never filed a new complaint. *See id.* at 1148–49. Nonetheless, when the LIFE Act retroactively repealed the jurisdiction-stripping provisions of § 377, the plaintiffs sought to invoke the court's jurisdiction for the purposes of litigating attorney's fees under the Equal Access to Justice Act ("EAJA"). Apparently without moving for reconsideration of the court's final order, which held that the court lacked jurisdiction, the plaintiffs argued that, "by retroactively repealing § 377 Congress vested the district court with jurisdiction and the court can therefore award fees." *Id.* at 1152. The Ninth Circuit disagreed.

In the process of rejecting the *Zambrano* plaintiffs' contention, some of the language in the Circuit's opinion has led defendants to believe that the plaintiffs here cannot avail themselves of the benefit of the LIFE Act's jurisdictional repeal. The *Zambrano* court said, "in reading the entire LIFE Act, it is clear that Congress was merely giving eligible class applicants a new opportunity to submit new applications that must satisfy new requirements." *Id.*

If this reading seems to fly in the face of the plain language of LIFE Act's repeal of § 377,[8] the confusion is deepened with the explanation that:

> The overall scheme of the new legislation reflects that the retroactive repeal of § 377 ... was meant to remove a jurisdictional obstacle to litigation that could ensue over applications pursuant to the newly amended amnesty provisions, and not that it was intended to retroactively bestow jurisdiction on the

---

**8.** As quoted in the *Zambrano* decision, the LIFE Act provided:

 (8) JURISDICTION OF COURTS–Effective as of November 6, 1986, [§ 377 of IIRIRA]

 shall not apply to an eligible alien described in subsection (b) of this section.
*See Zambrano* at 1152–53.

district court for the purposes of awarding fees.

*Id.*

I confess that I am more than a little perplexed by this language. Defendants do not have to stretch far to argue that, notwithstanding the statute's plain language, the Circuit found that Congress intended the retroactive repeal not to be retroactive. In the context of the paragraphs that follow, however, it appears that the Circuit was not concerned with LIFE's retroactive repeal of § 377 per se, but with the notion that Congress could reverse the final judgment of a court. The Court of Appeals explained:

> Plaintiffs argue that ... by retroactively repealing § 377 Congress vested the district court with jurisdiction and the court can therefore award fees. However, for this argument to prevail, Congress would have to undo a final judgment of this court. This cannot be done. "Having achieved finality ... a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was."

*Id.* (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995)).

Given *Zambrano*'s reliance on *Plaut*, I conclude that it does not foreclose this court's decision to reopen *CSS I*. *Plaut* was concerned with a statute which directed the courts to reopen a class of cases that had been finally adjudicated. *See Plaut*, 514 U.S. at 215, 115 S.Ct. 1447 (quoting statutory language providing that cases "shall be reinstated"); *id.* at 230, 115 S.Ct. 1447 ("apart from the statute we review today we know of no instance in which Congress has attempted to set aside the final judgment of an Article III court

by retroactive legislation"). Thus, for *Plaut* to compel the holding in *Zambrano*, the Court of Appeals must have understood the plaintiffs to argue that the LIFE Act "require[d] its own application in a case already finally adjudicated ...." *Plaut*, 514 U.S. at 225, 115 S.Ct. 1447. Clearly the LIFE Act did not and could not do this.

As distinct from the theory apparently advanced by the *Zambrano* plaintiffs, however, in this case the court never found that the LIFE Act required it to reverse its dismissal of *CSS I* for lack of subject matter jurisdiction. The LIFE Act's retroactive change in the law was viewed only as an "extraordinary circumstance" that made reconsideration "appropriate." *See* August 27 Order at 11 (noting also that "[a] post-judgment change in the law having retroactive application may, in special circumstances, constitute an extraordinary circumstance warranting vacation of a judgment)." *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir.1989)(quoting *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir.1986)). Thus, reopening *CSS I* was not the result of an impermissible legislative revision of a judgment, but rather, a judicial revision after the legislature removed an obstacle it had previously erected. *Cf. Plaut*, 514 U.S. at 233–34, 115 S.Ct. 1447 (Fed.R.Civ.P. 60(b) does not impose any legislative mandate to reopen, but merely reflects the courts' own inherent discretionary power). Because the circumstances here are wholly distinct from those in *Zambrano* as described by the Circuit, that case does not control.

Accordingly, defendants' motion to reconsider reopening *CSS I* is denied.

## B. MOOTNESS

### 1. *LIFE Act*

■ Despite this court's determination that, by virtue of the LIFE Act's retroac-

tive repeal of § 377, *CSS I* plaintiffs could continue to seek relief under IRCA, defendants argue that the LIFE Act moots plaintiffs' claims. Certainly the final regulations implementing LIFE appear to go to great lengths to accommodate the plaintiffs in this case.[9] As I now explain, however, the availability of relief under LIFE does not necessarily moot plaintiffs' claims under IRCA.

■ Defendants correctly note that Congress has the "ability to moot a pending controversy by enacting new legislation." *Stop H–3 Ass'n v. Dole*, 870 F.2d 1419, 1432 (9th Cir.1989) (suit claiming that highway project violated National Environmental Policy Act rendered moot when legislation exempted project from otherwise applicable impact requirements). Defendants cite several cases standing for the notion that, when a statute giving rise to a claim for prospective relief is superseded, the action is moot to the extent that the claim is premised on the portion of the statute that has been superseded. *See, e.g., Native Village of Noatak v. Blatchford*, 38 F.3d 1505,1509–1510 (9th Cir. 1994); *Bunker Ltd. Partnership v. United States*, 820 F.2d 308, 312 (9th Cir.1987).

In the case at bar, however, the avenue of relief provided by section 1104 of the LIFE Act is clearly not intended to supersede that available under IRCA. Although section 1104 of the LIFE Act incorporates some of the provisions of section 245A of the INA, i.e. IRCA, it did not simply incorporate all of IRCA. Rather, many of the benefits and requirements available under IRCA were presented in substantially modified form in the LIFE Act. *See* Section 1104(c) of the LIFE Act. Significantly, these modifications took place within the confines of LIFE, and Congress did not amend IRCA itself. Further, as to those plaintiffs eligible for relief under LIFE, the LIFE Act also explicitly reopens the avenue of relief provided by IRCA, retroactively repealing the jurisdictional bar that had prevented this court from hearing the claims of many plaintiffs who sought the right to apply under IRCA. *See* n. 8.

■ Defendants fail to provide any authority for the proposition that when Congress provides a new avenue by which to receive an entitlement, claims to that entitlement via any other avenue become moot. Nor can defendants provide such authority. It is black-letter law that, "[w]here an additional statutory remedy is added to one previously created without expressly or impliedly supplanting or abrogating it, the new statutory remedy is generally not deemed to be exclusive." 1 Am.Jur.2d Actions § 63 (1994). *See, e.g., United States v. Jordan*, 915 F.2d 622, 627 (11th Cir.1990); *Leist v. Simplot*, 638 F.2d 283, 313 (2d Cir.1980); *Supreme Grand Lodge v. Most Worshipful Prince Hall Grand Lodge*, 209 F.2d 156, 157 (5th Cir. 1954); *see also Rodriguez v. United States*, 480 U.S. 522, 524, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (noting presumption against repeals by implication). In sum, where Congress has left open the availability of other remedies, a new remedy does not moot claims under other remedies. *See Reporters Comm. for Freedom of the Press v. Sampson*, 591 F.2d 944, 948–950 (D.C.Cir.1978) (the passage of the Presidential Recordings and Materials Preservation Act did not moot an action seeking

---

9. For example, under the final regulations, the definition of "eligible alien" has been interpreted to cover not only the alien who submitted a claim for class membership (in this case, filed for interim relief), but also the spouse or child of that alien. *See* 67 Fed.Reg. 38350 (to be codified at 8 C.F.R. § 245a.10); Comments at 67 Fed.Reg. 38344. Defendants represented in their briefing and at hearing that, by virtue of this interpretation, all of the named plaintiffs in this case are "eligible aliens" for purposes of the LIFE Act. Thus, all named plaintiffs in this case are members of either subclass one or two.

access to President Nixon's papers under the Freedom of Information Act where the Materials Preservation Act explicitly permits alternative resort to the Freedom of Information Act).

Given the non-exclusivity of LIFE, defendants come the closest to mooting plaintiffs' claims by providing that if a LIFE applicant is not ultimately eligible for adjustment under § 1104 of the LIFE Act, the INS will consider whether that applicant is eligible under IRCA. *See* 67 Fed. Reg. 38350 (to be codified at 8 C.F.R. § 245a.6); Comments at 67 Fed.Reg. 38347. As generous as this regulation is, it nonetheless does not provide plaintiffs the choice, given by Congress, to apply under either or both statutes. Nor is this a distinction without a difference. For instance, because the family unity benefits are more favorable under IRCA than they are under LIFE, *see* 67 Fed.Reg. 38348, a plaintiff might be eligible under both statutes, but prefer to apply under IRCA.

Moreover, plaintiffs voice the legitimate concern that defendants have provided no real standards for determining whether an applicant has established his or her eligibility to apply under IRCA.[10] After sixteen years of litigation, plaintiffs are to be forgiven if they do not trust that the INS will appropriately determine whether an applicant sufficiently established that he or she was front-desked or that front-desking was a substantial cause of the applicant's failure to apply.

Indeed, to the extent that the regulations leave to INS discretion the decision of who may submit an IRCA application, they represent a brand of voluntary cessation that would not render this case moot. The INS's track record for voluntarily accepting or adjudicating IRCA applications is not reassuring. More than once the INS has expressed an intent to accept and adjudicate the applications of at least those who were front-desked, while its actions tell a different story.[11] As I discuss below,

---

**10.** The final regulations, in pertinent part, simply provide:

> In such adjudication ... the district director will deem "the date of filing the application" to be the date the eligible alien establishes that he or she was "front-desked" or that, though he or she took concrete steps to apply, the front-desking policy was a substantial cause of his or her failure to apply.

67 Fed.Reg. 38350 (to be codified at 8 C.F.R. § 245a.6)

**11.** For example, in their December 15, 1994 motion to dismiss, defendants represented that the INS "remains willing" to accept IRCA applications of front-desked plaintiffs, and "[t]hus, there is no case or controversy with respect to any front-desked alien for this court to adjudicate." *See* Points and Authorities in Support of Defendants' Motion to Dismiss Plaintiffs' Seventh Amended Complaint at 14–15. Hardly one month later, and before this court had ruled on their motion to dismiss, the INS issued an internal Telegraphic Message directing regional offices to cease accepting class membership applications, and

rescinded all benefits of class membership. *See* February 6, 1995 Order at 2.

Again on February 6, 1998, after the Ninth Circuit had remanded *CSS I* to this court with instructions to dismiss but before this court had acted, the INS issued an internal memo stating:

> EFFECTIVE IMMEDIATELY, *CSS* CLASS MEMBERS ARE NO LONGER ENTITLED TO EMPLOYMENT AUTHORIZATION, STAYS OF REMOVAL, OR ANY OTHER IMMIGRATION BENEFIT BASED ON THEIR CLAIMED *CSS* CLASS MEMBERSHIP.

Application for TRO in *CSS II* ("*CSS II* TRO") Exh. 4. In an April 15, 1998 letter to class counsel, the INS's Paul Virtue assured counsel that applications of front-desked class members would nonetheless be accepted and adjudicated. Letter from Paul Virtue, *CSS II* TRO Exh. 40. In fact, *CSS* class members who informed INS officers that they had been front-desked, having attempted to submit a completed application and fee during the statutory period, were simply told that *CSS* was over. *See* Essani Decl. ¶ 8, *CSS II* TRO Exh. 9 (visited INS office in May, 1998 and was

the one time that the INS actually instituted a program to adjudicate IRCA applications, most would-be applicants were denied leave to apply in a non-reviewable screening process, while those who were given leave to apply have yet to see their applications adjudicated.

### 2. *Legalization Questionnaire Program*

The Legalization Questionnaire Program made its first appearance in this case when, with their motion to stay the preliminary injunction issued in *CSS II*, defendants introduced their "Legalization Questionnaire" with attending instructions to INS regional officers to begin identifying front-desked IRCA applicants. *See* Attachment A to Defendants' Supplemental Memorandum to Stay Preliminary Injunction in *CSS II*, filed July 10, 1998. The idea was that the INS could identify, via the questionnaire, who had been front-

desked, and grant those individuals the right to submit an IRCA application. The Legalization Questionnaire Program was later modified in response to an injunction issued on July 2, 1999 requiring the INS to adjudicate legalization applications of class members in the case of *Newman v. INS*, No. Civ. 87–4757 (C.D. Cal.).

However the program may have worked for those covered by the *Newman* injunction, for *CSS* class members it was fraught with problems. First, according to the evidence before the court, the INS's publicity efforts for the program were limited to a posting on the INS website. For those class members who did know that they could participate in the Legalization Questionnaire Program, the majority had their questionnaires rejected with no opportunity for review.[12] *See* Shuttle Depo. 54:14. Those whose questionnaires were approved and were subsequently given leave to file an IRCA application have yet

---

denied further stay of deportation and employment authorization although he explained how he had been front-desked); Njoya Decl. ¶¶ 3–5, *CSS II* TRO Exh. 14 (had his IRCA application twice rejected when he visited INS office in March and May of 1998, despite telling the INS officers how he had been front-desked); Haq Depo at 114:14, 112:8–17 and Decl. ¶ 7, *CSS II* TRO Exh. 32(received advance parole to go abroad, but upon his return on February 20, 1998, was detained for about thirteen months, despite explaining how he had been front-desked).

In defense of their lackluster record for voluntarily accepting or adjudicating IRCA applications, defendants noted at the hearing on these motions that the INS was never under a court order to do so. Precisely plaintiffs' point. *Cf. County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (County had, for many years, successfully operated program to end employment discrimination, so that when the case reached the Supreme Court, it was moot).

12. That most applications were rejected is not surprising given the manner in which the questionnaires were adjudicated. No ques-

tionnaires were adjudicated at all until February of 1999, just before the hearing at the Ninth Circuit on defendants' appeal of this court's preliminary injunction. At that time, 400 pending questionnaires were adjudicated in the course of a week. *See* DeShazor Depo. 38:21, Exh. 7 to Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings or Summary Judgment in *CSS II*, filed August 2, 1999. DeShazor, the INS officer initially in charge of adjudicating the questionnaires, was given no written instructions for processing the questionnaires. *See Id.* 106:21–24. Rather, along with her superior officer she created her own "matrix," that provided factors for consideration but no guidance as to the weight that should be given to the factors or to supporting documentation. *Id.* at 80:14–18; 81:1–2. Of the 400 cases reviewed at this time, only 35 were approved; the rest, denied. *Id.* 43:14–17. According to the INS officer currently in charge of providing guidance over the questionnaire process, although there were changes that have brought the approval rate to an estimated 30 percent, the INS did not attempt to contact those whose questionnaires had been rejected before the changes took place. Lee Depo. 10:8–10;19:8–9.

to see their applications be adjudicated. *See* Lee Depo. 31:20–32:25 (stating that until the INS can update their system to generate a temporary residence form that has a photo on it, no cases can be approved); Oki Depo. 12:13–23; 24:23–24 (couldn't adjudicate applications because they were awaiting "Policy Memo 3" which would provide specific guidance).

■ Although no IRCA applications have been approved since the inception of the questionnaire program in 1998, defendants argue that plaintiffs who were granted leave to file IRCA applications have no remaining case or controversy. Had plaintiffs simply sought a general right to apply under IRCA, I would agree. But plaintiffs have not, and I do not. Rather, from the inception of this litigation to the present, plaintiffs have sought relief from the advance parole regulation and its consequences. *See* Eighth Amended Complaint, filed February 15, 2002, at 22:4–16. Thus, unless and until their applications are both accepted for filing and adjudicated without regard of the offending regulation, plaintiffs' injuries will not be cured.[13]

■ Defendants also suggest that plaintiffs who knew of the Legalization Questionnaire Program or who became named plaintiffs after the program was initiated should be dismissed for failure to exhaust administrative remedies. This argument is also without merit. As the Legalization Questionnaire Program created by the INS was not a congressionally-mandated administrative remedy, the court is not barred from considering the claims of plaintiffs who failed to take advantage of the program. *See McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). Where exhaustion is left to judicial discretion, the court may "allow the action to proceed immediately, it may dismiss the action pending exhaustion of administrative remedies, or it may stay its own proceedings pending administrative review." *Morrison–Knudsen Co. v. CHG Int'l, Inc.,* 811 F.2d 1209, 1223 (9th Cir.1987). Here, there is obviously no reason for the court to dismiss or stay plaintiffs' action pending exhaustion of the purported administrative remedy because, by defendants own concession, the Legalization Questionnaire Program was terminated on February 2, 2001. There is no longer any remedy to exhaust.

## C. STANDING/RIPENESS

### 1. *Organizational Standing*

■ Where the defendants' "practices have perceptibly impaired [the organizational plaintiff's] ability to provide [the services it was formed to provide] ... there can be no question that the organization suffered injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (alleging injury to organization's activities and consequent drain on its resources satisfies injury requirement for organization to assert standing in its own right).

---

**13.** Defendants' contention that only the right to apply is at stake may indicate a lack of understanding on their part concerning the scope of this court's authority. It is true that this court cannot, except on an order of deportation, review "a determination respecting an application of adjustment of status" under IRCA. *See* 8 U.S.C. § 1255a(f)(1). This is not to say however, that the defendants can act with impunity if only they allow plaintiffs to apply. Rather, were defendants to apply the invalid regulation during the adjudication process, for example, the court could act to enforce its orders so long as it did not undertake a review of the ultimate determination on adjustment of status. *Cf. Reno v. Catholic Social Services,* 509 U.S. 43, 64, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (discussing the meaning of a "determination" in light of IRCA's administrative review provision, which describes review of "the administrative record established at the time of the determination on the application").

In keeping with this principle, Catholic Social Services ("CSS") alleges that the defendants' actions have made it more difficult for it to represent clients and are a drain on CSS resources. The AFL–CIO and United Farm Workers ("UFW") allege that defendants' actions have made it more difficult for them to represent alien union members and to organize prospective members that are denied the opportunity to legalize their status and work legally.

 Although "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice ... [i]n response to a summary judgment motion ... the plaintiff ... must 'set forth' by affidavit or other evidence 'specific facts,' Fed.R.Civ.P. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Here, plaintiffs present no evidence that CSS has been affected in the manner alleged. Nor do the declarations on file in support of UFW organizational standing support its allegations Rather, the declarations on file document an injury suffered by UFW by virtue of its duties as a Qualified Designated Entity (QDE).[14] Because UFW's obligations as a QDE ceased at the end of the statutory period for IRCA applications, these declarations no longer document a live claim.

Finally, the evidence offered to establish the standing of the AFL–CIO is also not on point. Plaintiffs direct the court to the 1987 declaration of Steven T. Nutter, then-Vice President of the California Labor Federation, AFL–CIO, to the effect that the organization and its members were harmed due to an "INS[ ] policy of not providing work authorization to workers who can establish a prima facie case for temporary resident status." Nutter Decl. 4:6–8, Ex. M of Plaintiffs' Points and Authorities in Support of a Preliminary Injunction filed February 27, 1987. Because the injury at stake in this litigation is not an INS policy of denying interim work authorization, plaintiffs have failed to document a live claim on the part of the AFL–CIO.

Summary judgment as to the organizational plaintiffs is appropriate.[15]

### 2. Named Plaintiffs

Before addressing defendants' contentions regarding each of the named plaintiffs, I note a few recurring issues that apply to several of the named plaintiffs.

 First, defendants raise a number of factual issues regarding some named plaintiffs' eligibility under IRCA. For example, defendants submit evidence which, they argue, contradicts Amardeep S. Dhannu's claim that he has lived in the United States since 1981. This court, however, is not concerned with whether the named plaintiffs are or are not ultimately eligible for relief under IRCA. As is reflected in the definitions of the subclasses, at issue here is whether the putative class member was otherwise prima facie eligible

14. As a QDE, UFW was under contract with the INS to process IRCA applications for farmworkers. UFW noted that if it were required to process "waivers of excludability" for the IRCA applicants it served, "it [would] significantly detract from [UFW's] ability to complete and file legalization applications for UFW members ..." Lopez Decl., Exh. OOOO, Exhibits filed April 15, 1988 in Support of Plaintiffs' Motion for Summary Judgment.

15. The court must express some frustration as to this order. Common sense suggests that efforts expended in connection with this litigation drain resources from other organizational efforts. Nonetheless, the issue is one of evidence not common sense and, in any event, common sense is what tells us the world is flat.

for legalization under section 245A of the INA but, because of the invalid regulation, was not able to apply. Thus, this court must determine simply whether or not a named plaintiff has established a prima facie case for eligibility and has a ripe claim under *Reno*, 509 U.S. 43, 113 S.Ct. 2485.[16] As IRCA makes clear, the courts have a very limited role in determining whether an alien is actually eligible for legalization under its provisions. *See Reno*, 509 U.S. at 54, 113 S.Ct. 2485 (noting that a denial of adjustment of status under IRCA is subject to review by a court "only in the judicial review of an order of deportation") (citing 8 U.S.C. § 1255a(f)).

Second, as to several named plaintiffs, the evidence does not conform to the complaint. Defendants point to contrary allegations in the complaint in an attempt to call into question the veracity of these plaintiffs' deposition testimony concerning their attempts to apply under IRCA.

 Plaintiffs argue that the complaint should be deemed amended to conform with the evidence under Rule 15(b). *See Apache Survival Coalition v. United States*, 21 F.3d 895, 910 ("when issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint, '[t]he district court should have construed [the matter raised]

as a request pursuant to rule 15(b)... To amend the pleadings out of time.' ") (quoting *Johnson v. Mateer*, 625 F.2d 240, 242 (9th Cir.1980)). Under Rule 15(b), the court may imply consent to the amendment of the pleadings if the opposing party implicitly consented to the amendment by failing to object to the evidence submitted.[17] *Casey v. Lewis*, 43 F.3d 1261, 1268–69 (9th Cir.1994) (*rev'd on other grounds* in 518, U.S. 343 (1996)). The court may also allow amendment over the opposing party's objections if to do so would be in the interest of justice and would not prejudice the opposing party. *See Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 212–13 (9th Cir.1994).

Here, the defendants have not objected to evidence submitted by plaintiffs that is contrary to the allegations in the complaint. Thus, although the deviation of proof from allegation is unfortunate, I agree with plaintiffs that the resolution of the problem is to amend the complaint to conform to the evidence.

I now turn to the question of whether the named plaintiffs have standing.

### a. *Miguel Galvez Moran*

Although Galvez Moran is prima facie eligible for legalization under IRCA, defendants argue the merits of his eligibility.

---

**16.** By prima facie, the court means "[a]t first sight, on the first appearance; on the face of it." *Black's Law Dictionary*. That is, the determination is made on the plaintiffs' showing without reference to contrary evidence. Consideration of contrary evidence is left to a merits determination.

**17.** Rule 15(b) provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may

be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial on these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Defendants contend that the purpose of Galvez Moran's trip abroad was not brief, casual and innocent, but was for the purpose of returning to Peru permanently. Defendants also attack plaintiff's credibility, contending that the allegations in the *CSS II* complaint regarding the date, length, and purpose of plaintiff's absence were inconsistent with those in the Seventh Amended Complaint. Plaintiffs argue that the mere fact that plaintiff testified he considered returning to Peru does not indicate he planned to go back permanently.

The question of whether a trip abroad is brief, casual and innocent is "one of fact to be resolved in a hearing, on a case-by-case basis ...." *Catholic Social Services v. Meese*, 685 F.Supp. 1149, 1159 (E.D.Cal.1988). It is pertinent to the disposition of plaintiff's legalization application, but not to this court's standing determination.

Because Galvez Moran is prima facie eligible for legalization under IRCA, and it is uncontested that his claim is ripe under *Reno*, no genuine issue of material fact remains as to Galvez Moran's standing. I find that Galvez Moran is a member of subclass two, as he was originally barred by § 377 but filed for interim relief in this case, and thus is covered by LIFE's *nunc pro tunc* repeal of § 377's jurisdictional bar.

### b. *Francisco Arizaga*

Defendants contend that Arizaga does not have a ripe claim under *Reno*. Defendants note that the current complaint alleges that Arizaga did not attempt to apply for legalization and argue that this calls into question the credibility of his testimony in his 1995 deposition that he did attempt to verify with the INS whether or not he was eligible to apply under IRCA.

Indeed, the complaint alleges that Arizaga learned from friends that his trip abroad disqualified him and he did not try to confirm this information with the INS because he was afraid he would be deported. Eighth Amended Complaint at 10 ¶ 22. As plaintiffs note, however, Arizaga did not verify the complaint, and both parties admit that he has testified that he visited the INS and was told that he did not qualify because he had left the country. Thus, under Fed.R.Civ.P. 15(b), the complaint is amended to conform to the evidence that Arizaga did go to the INS and seek to apply.

Because the evidence shows that Arizaga has a ripe claim under *Reno*, and as defendants do not contest plaintiff's prima facie eligibility for relief under IRCA, no genuine issue of material fact remains as to Arizaga's standing. I find that Arizaga is a member of subclass two, as he was originally barred by § 377 but filed for interim relief in this case, and thus is covered by LIFE's *nunc pro tunc* repeal of § 377's jurisdictional bar.

### c. *Catalina Herrera*

Defendants maintain that a genuine issue of material fact exists as to whether or not Herrera's claim is ripe under *Reno*. They point out that the complaint alleges that Herrera was too young to file her own application and that she remains undocumented because her mother was prevented from filing a legalization application. Defendants then argue that Herrera's testimony is confused, and that she states that her father attempted to file only an application in his name, but then testifies that he attempted to file separate legalization applications, including one for her.

The argument seems misdirected since the only testimony defendants cite refers to Herrera's mother, not her father.

Nonetheless, I do note that her testimony appears confused on the issue of whether her mother filed a separate application for her or not. *See* Defendants' Statement of Material Facts Exh. 2 at 51–52 (mother tried to file application that included her); *id.* at 74–75 (mother attempted to file five separate applications). As plaintiffs point out, however, this should come as no surprise as Herrera was only ten years old at the time the application process occurred. *Id.* at 62. Indeed, Herrera's testimony about the application process may not be admissible, as she admitted at one point in her deposition that her testimony was based on her recollection of what her mother told her happened, rather than her personal knowledge. *Id.* at 62. In contrast, Catalina Herrera's mother did testify from personal knowledge, and has unambiguously stated that she attempted to file separate applications and fees for each of her children born in Mexico, including Catalina. *See* 2002 Santos Depo. at 64–67. Thus, the only reliable evidence shows that Herrera's mother attempted to file an application for Herrera and was rejected on the basis of the invalid travel rule. Under Rule 15(b), the complaint is amended to conform to the evidence.

Because the evidence shows that Herrera has a ripe claim under *Reno,* and as defendants do not contest that Catalina Herrera is prima facie eligible for legalization under IRCA, no genuine issue of material fact remains as to Herrera's standing. I find that Herrera is a member of subclass one, as her mother attempted to file a completed application and fee, but was front-desked.

### d. *Raymundo Callanta*

■ Defendants argue that Callanta does not have a ripe claim under *Reno.* It is uncontested that Callanta's mother tried to submit completed applications and money orders for herself and Callanta, but was front-desked because she had traveled to the Phillippines in violation of the invalid regulation. Although Callanta's mother made the INS officer aware that she had a separate application for her son, *see* Corazon Callanta Depo. at 86–87, his application was also rejected, apparently under the assumption that he had traveled with his mother. Callanta, however, had not left the United States with his mother. Thus, defendants argue, he was not injured by the invalid regulation.

I disagree with defendants that Callanta's claim is not ripe. Under *Reno,* this is a scenario where the "front desking policy was a substantial cause of [Callanta's] failure to apply, so that [he] can be said to have had the 'advance parole' ... regulation applied to [him] in a sufficiently concrete manner to satisfy ripeness concerns." *Reno,* 509 U.S. at 66 n. 28, 113 S.Ct. 2485.

Because the evidence shows that Callanta has a ripe claim under *Reno,* and as defendants do not contest that Callanta is prima facie eligible for legalization under IRCA, no genuine issue of material fact remains as to Callanta's standing. As Callanta's mother attempted to file a completed application and fee on his behalf but was front-desked, I find that Callanta is a member of subclass one.

### e. *Raquel Rebolledo*

■ Defendants argue that Rebolledo's claim is not ripe under *Reno.* During the statutory period, Rebolledo's father took a single application, on which he included himself, his wife, and Rebolledo, to the INS. Ordinarily when family members were mistakenly all placed on a single application, the INS officer or QDE officer informed the individual submitting the application that a separate application had to be filed for each family member. *See* Pierre Depo. at 90–91. Upon learning that Rebolledo's father had traveled in violation of the invalid regulation, however, the INS

officer rejected his application without noticing that it contained more than one name. Not that the outcome would have changed had Rebolledo's father submitted an additional application for her. Raquel Rebolledo had accompanied her father on his trip. Nonetheless, defendants argue that it was not Rebolledo whose application was rejected, but that of her father.

Here again, the front-desking policy was clearly a "substantial cause of [Rebolledo's] failure to apply," *Reno* at 66 n. 28, 113 S.Ct. 2485. Thus, under *Reno*, Rebolledo "can be said to have had the 'advance parole' ... regulation applied to [her] in a sufficiently concrete manner to satisfy ripeness concerns." *Id.*

As Rebolledo's claim is ripe under *Reno*, and as defendants do not contest that she is prima facie eligible for legalization under IRCA, no genuine issue of material fact remains as to Rebolledo's standing. Because, according to the final regulations implementing the LIFE Act, Rebolledo is deemed to have filed for class membership, *see* note 9, *supra*, I find that she is a member of subclass two.

**f. *Amardeep S. Dhannu and Jasdeep S. Dhannu***

 Although the Dhannu brothers are prima facie eligible for legalization under IRCA, defendants argue the merits of their eligibility. Defendants contend that the Dhannu brothers are not entitled to relief under IRCA because, they argue, the Dhannu family's trip abroad was not brief, casual and innocent, but was for the purpose of returning to India permanently. Plaintiffs counter that the Dhannu's first trip abroad was brief, casual, and innocent, and that only after their legalization applications were rejected by virtue of that trip did plaintiffs' father considered returning to India permanently.

The question of whether a trip abroad is brief, casual and innocent is "one of fact to be resolved in a hearing, on a case-by-case basis ...." *Catholic Social Services v. Meese*, 685 F.Supp. 1149, 1159 (E.D.Cal. 1988). It is pertinent to the disposition of plaintiffs' legalization application, but not to this court's standing determination.

Defendants also submit evidence which, they argue, shows that Amardeep S. Dhannu did not arrive in the United States in 1981 as he contends. Again, this is pertinent to the disposition of the plaintiff's legalization application, but not to this court's standing determination.

Because the Dhannu brothers are prima facie eligible for legalization under IRCA, and as it is uncontested that their claims are ripe under *Reno*, no genuine issue of material fact remains as to their standing. As their father submitted completed applications and fees on their behalf, the Dhannu brothers are members of subclass one.

**g. *Esaul Delgadillo–Uribe***

Defendants argue that Delgadillo–Uribe's claim is moot because he has a pending legalization application before the INS that was submitted pursuant to the legalization questionnaire program. As already noted, until his IRCA application is adjudicated without resort to the offending regulation, plaintiff's claim will not be moot.

Defendants do not contest that Delgadillo–Uribe is prima facie eligible for legalization under IRCA or that his claim is ripe under *Reno*. Thus, no genuine issue of material fact remains as to his standing. Because he submitted a completed application form and fee to the INS, Delgadillo–Uribe is a member of subclass one.

**h. *Anil K. Urmil***

Defendants argue that Urmil's claim is moot because he has a pending legalization application before the INS that was submitted pursuant to the Legalization Questionnaire Program. As already noted, un-

til his IRCA application is adjudicated without resort to the offending regulation, plaintiff's claim will not be moot.

Defendants do not contest that Urmil is prima facie eligible for legalization under IRCA or that his claim is ripe under *Reno*. Thus, no genuine issue of material fact remains as to his standing. Because he submitted a completed application form and fee to the INS, Urmil is a member of subclass one.

### i. *Ismael De la Cruz*

█ Defendants appear to argue that De la Cruz does not have a ripe claim under *Reno*. Defendants state, without explaining or providing evidence, that the "printer notations on plaintiff's application form show that plaintiff's claim regarding the document are false." Apparently defendants wish to contest plaintiff's claim that he tried to file his application in 1987. Plaintiff notes that the printed document date is 5/15/87 and the date on which he signed his application form is 9/30/87. I can see no reason not to believe that plaintiff submitted his application in 1987 on the basis of said "printer notations."

Because the evidence shows that De la Cruz's claim is ripe under *Reno*, and as defendants do not contest that he is prima facie eligible for legalization under IRCA, no genuine issue of material fact remains as to De la Cruz's standing. De la Cruz attempted to file a completed application and fee, and, as such, is a member of subclass one.

### j. *Elma Barbosa*

Because defendants do not contest that plaintiff is prima facie eligible for legalization under IRCA, or that her claim is ripe under *Reno*, no genuine issue of material fact remains as to her standing. Barbosa attempted to file a completed application and fee, and thus is a member of subclass one.

### k. *Jesus Reyna Reyna*

█ Defendants contend that a genuine issue of material fact exists as to whether or not Reyna is prima facie eligible for legalization, because at his deposition he did not even claim to have been in the United States during the required statutory period.

Reyna was in Mexico at the time his deposition was apparently taken over the telephone and he spoke through an interpreter. *See* Defendants' Statement of Material Facts Exh. 14 at 4–5. To complicate the communication difficulties inherent in this set-up, it was evident by his deposition testimony that Reyna was mentally impaired. *See also* Plaintiffs' Opposition, Exh. 15 at 494 (notes of INS interviewer observing plaintiff was "very 'slow'"). Throughout the deposition, plaintiff endeavored to answer questions about the time that he had spent in the United States. However, he clearly could not remember or comprehend well enough to even establish whether he was actually in the U.S. continuously for the statutory period. *See Id.* at 47;54; 59 (recalled that he had lived in the United States for seven or eight years, and with leading questions by counsel, recalled two residences in Houston in 1979 and 1986).

Were plaintiff's deposition the only evidence that we have, plaintiff's obvious mental infirmity would make it impossible to say that he is prima facie eligible. However, the INS has previously determined that Reyna was prima facie eligible for legalization, as he was issued temporary employment authorization as a class member in this case. Plaintiffs' Opposition, Exh. 14 at 475, 490, 508. The fact that plaintiff has, over the course of this lengthy litigation, become too feeble-minded to assert those facts which previously rendered him prima facie eligible for legalization should not preclude his eligibility.

Although this court cannot determine whether plaintiff is actually eligible for legalization under IRCA, because defendants have previously found him prima facie eligible, they are arguably estopped from arguing that he is not prima facie eligible.

Defendants also contend that Reyna does not have a ripe claim under *Reno.* Notwithstanding Reyna's difficulties with memory or comprehension, however, he testified that he did recall that he attempted to apply for legalization "sometime in 1987," Reyna Depo. at 34, but that he did not qualify because he had gone to Mexico. *Id.* at 32–33. Although he did not recall whether he filled out an application, he did recall he had a money order with him. *Id.* at 34–35. He remembered that he had "papers" with him too. *Id.* at 60. Thus, at the very least he would fall within subclass two, as the travel regulation was a substantial cause for why he did not apply and because he applied for interim relief in this case.

As a final observation, however, I note that these determinations may do Reyna no good. Reyna is in Mexico. Pursuant to a March 15, 1998 "Notice to Alien Ordered Removed/Departure Verification," he is prohibited from entering or attempting to enter the United States again for "five years." As explained in *Catholic Social Services v. Thornburgh,* 956 F.2d 914, 923 (1992), this court cannot order class-wide relief for class members abroad. Whether such relief is available for individual plaintiffs has not been addressed by the parties. Whether Reyna's claim is redressable, then, remains in question, and

summary judgment is inappropriate as to this named plaintiff.

### 1. *Mohammed Haq*

Defendants argue that Haq's claim is moot because he has a pending legalization application before the INS that was submitted pursuant to the Legalization Questionnaire Program. As already noted, until his IRCA application is adjudicated without resort to the offending regulation, plaintiff's claim will not be moot.

Defendants do not contest that Haq is prima facie eligible for legalization or that his claim is ripe under *Reno.* Thus, no genuine issue of material fact remains as to his standing. Because Haq submitted a completed application form and fee to the INS, he is a member of subclass one.

### C. MERITS

 As already noted, the merits of this case have been previously decided and are essentially uncontested. In *Catholic Social Services, Inc. v. Meese,* 685 F.Supp. 1149 (E.D.Cal.1988), this court found that the INS's travel regulation, 8 C.F.R. § 245a.1(g) was invalid under IRCA, and thus class members had been improperly deprived of the opportunity to apply for adjustment of their status. Defendants did not contest that finding at the time, but appealed the final remedy imposed by this court. Since then, no court has suggested that the court's conclusion is in error, nor has there been other intervening law or facts to cause this court to reconsider its determination. Indeed, defendants do not seek reconsideration of that order. Thus, this court's 1988 decision remains the law of the case.[18]

18. "Under the 'law of the case' doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997)(citing *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2443, 124

L.Ed.2d 661 (1993)). Although motions to reconsider are directed to the sound discretion of the court, *see Kern–Tulare Water Dist. v. City of Bakersfield,* 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part and rev'd in part on other grounds,* 828 F.2d 514 (9th Cir.1987), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988), considerations of ju-

Because plaintiffs' injury can be fully remedied on the basis already decided, I do not reach plaintiffs' alternative bases for relief.[19]

## III.

### RELIEF

 Given the law of the case, there can be no question that plaintiffs are entitled to permanent injunctive relief. What form that relief should now take represents a difficult problem.

Fourteen years ago, the form of appropriate relief was not nearly so difficult. Then, the INS had resources available to allocate to the legalization process, institutions now gone were in place, and those who were entitled to relief were much more readily identified and reached. The intervening delay has made both the identity of potential class members and the means of informing them of their right to apply more difficult. Moreover, the passage of time has undoubtedly affected the availability of evidence to support their claims. In addition, the resources and people available to process the legalization program then, undoubtedly have now been allocated elsewhere. Finally, the agency now has institutional problems arising out of recent events that did not exist in the past.

While, of course, the plaintiffs ought not to suffer from the delay caused by the government's stubborn refusal to conform its conduct to the law, that truism does not answer the issue. How to reconcile the changed circumstances noted above, is, to say the least, not readily apparent.

The court takes some comfort in the notion that plaintiffs' counsel are expert in the rights and status of their clients, while defendants are fully conversant with their resources and will have insight as to how they can best accomplish implementation of the court's order. Given the knowledge of both sides, it appears to the court that the best course is to ask the parties to advise the court as to how to proceed.

The court fully understands the mutual suspicion that this litigation has engendered. Nonetheless, the court has some small hope that the parties will come to the conclusion that cooperation rather than further interminable litigation is the best course. Perhaps plaintiffs will conclude that cooperation and compromise is better than litigation, and the defendants will come to understand the LIFE statute manifested Congress' intent that the Service provide the plaintiffs with the relief first provided by IRCA, and thus end this litigation.

With this faint hope in mind, the court directs that the parties commence a meet-and-confer process not later than fifteen (15) days from the effective date of this order, at a place and time mutually convenient. During this process, the parties shall seek a mutually satisfactory injunctive order.[20] If they are able to reach

---

dicial economy weigh heavily in the process. Thus, Local Rule 78–230(k) requires that a party seeking reconsideration of a district court's order must brief the "new or different facts or circumstances ... which ... were not shown upon such prior motion, or what other grounds exist for the motion." Generally speaking, before reconsideration may be granted, there must be a change in the controlling law or facts, the need to correct a clear error, or the need to prevent manifest injustice. *See Alexander,* 106 F.3d at 876.

19. Plaintiffs challenge the validity of the advance parole regulation on the additional basis that it was issued without notice and comment rulemaking. Plaintiffs also claim that the front-desking policy was contrary to the provisions of IRCA and violated the Equal Protection and Due Process guarantees of the Constitution.

20. The government may, of course, if it chooses, reserve the right to appeal this court's determination that injunctive relief is appropriate.

agreement, they shall embody it in a proposed stipulated order. If they are unable to reach a full agreement within forty-five (45) days of the effective date of this order, they shall embody as much of an agreement as they are able to reach in a document, which also sets out what each side's position is as to the matters they are unable to agree upon, specifying the contentions supporting their position.

The court will entertain a motion to continue if the parties believe that an extension would enable them to come to an agreement.

## IV.

### CONCLUSION AND ORDERS

For the reasons stated above, the court ORDERS as follows:

1. Defendants' motion for reconsideration on the basis of *Zambrano v. INS*, 282 F.3d 1145, 2002 WL 356299 (9th Cir.2002) is DENIED.

2. Defendants' motion for partial summary judgment is DENIED except as to the organizational plaintiffs.

3. Plaintiffs' motion for partial summary judgment is GRANTED except as to the organizational plaintiffs and plaintiff Jesus Reyna Reyna.

4. Until the court determines the terms of a permanent injunction, the terms of the preliminary injunction heretofore ordered shall remain in effect.

5. The parties shall meet and confer and proceed as directed in Section III above.

IT IS SO ORDERED